**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 16 2014, 9:56 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ROBERT LEIRER JUSTICE**
Logansport, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
**ABIGAIL R. MILLER**
Certified Legal Intern
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of K.B., Minor Child, and J.B., Father, ) ) ) | |
| J.B., ) | |
| Appellant-Respondent, ) | |
| vs. ) | No. 09A02-1404-JT-247 |
| INDIANA DEPARTMENT OF CHILD SERVICES, ) ) | |
| Appellee-Petitioner. ) | |

APPEAL FROM THE CASS SUPERIOR COURT
The Honorable Richard A. Maughmer, Special Judge
Cause No. 09D02-1205-JT-33

**December 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

J.B. ("Father") appeals the juvenile court's order terminating his parental rights to his child, K.B ("Child"). He raises several issues on appeal, which we consolidate and restate as: whether sufficient evidence was presented to support the termination of Father's parental rights.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On January 12, 2011, Child was born to Father and A.H. ("Mother").[1] Because of Mother's drug abuse during her pregnancy, Child's urine and meconium were tested for the presence of drugs. The results of the test showed that Child's urine was positive for benzodiazepines and Child's meconium was positive for opiates and THC. The local Cass County office of the Indiana Department of Child Services ("DCS") got involved, and a Child in Need of Services ("CHINS") petition was filed on January 24, 2011. The petition alleged that both parents had a substance abuse problem which impaired their ability to care for Child. DCS was granted custody of Child, and after being dismissed from the hospital, Child was placed in relative foster care. On May 4, 2011, the juvenile court adjudicated Child to be a CHINS, and a dispositional decree was entered, ordering Father to, among other things: (1) obtain and maintain suitable housing and a source of income; (2) submit to random drug screens; (3) submit to a psychological evaluation; (4) participate in home-based counseling; (5) submit to a substance abuse assessment and follow all recommendations; and (6) participate in parenting time with Child. On May 8, 2012, DCS

---

[1] Mother died while this case was pending. We, therefore, only refer to the facts pertinent to Father's appeal.

filed a petition to terminate Father's parental rights. Evidentiary hearings were held on September 26, 2013, January 22, 2014, January 23, 2014, and February 27, 2014.

During the hearing dates, the following testimony and evidence was presented. When DCS filed the CHINS petition, both Father and Mother were addicted to drugs. Prior to Child's birth, Father had been hospitalized twice in 2010 for drug overdoses, on August 12, 2010 and November 20, 2010. As part of the CHINS case, Father was ordered to submit to random drug screens. Father tested positive for hydrocodone and methadone on February 28, 2011 and for heroin and morphine on May 4, 2011. Father testified that he continued to use morphine throughout the beginning of the CHINS case until June 15, 2011, when Mother went to a rehabilitation center. *Tr. Vol. III* at 217. Around the end of 2011 and the beginning of 2012, Father used Spice. Both Mother and Father relapsed at this time, and on February 12, 2012, Mother passed away.[2] On February 15, 2012, Father tested positive for alcohol and Spice. On March 13, 2012, he tested positive for alcohol and methylone, also known as bath salts. Throughout most of the rest of 2012, no drug screens were done. Beginning in 2013, a new drug screen coordinator began administering Father's drug screens. Father tested positive for alcohol on April 17, 2013 and again on May 22, 2013. Father did not test positive for anything from that date forward but he missed ten drug screens in 2013, and the last drug screen administered to him was on August 29, 2013.

---

[2] It is unclear from the record the exact cause of Mother's death. There was, however, testimony that Father and Mother were smoking Spice and drinking alcohol that night. *Tr. Vol. I* at 154.

Father attended Narcotics Anonymous ("NA") meetings as a condition of home detention, but he did not attend consistently and stopped attending around May or June 2013. At the end of 2013, Father began attending NA meetings again, but at the time of the hearings, he did not yet have a NA sponsor. Father testified that he was no longer addicted to drugs, but service providers found his continued use of alcohol to be a major concern. Father completed a substance abuse assessment with Deborah Carithers ("Carithers") from Four County Counseling. He was not forthcoming with Carithers about his drug use, but she learned from DCS that he participated in intravenous drug use. Father was referred to Four County Counseling for intensive outpatient treatment, which is normally sixty hours, but his treatment was modified to eighty hours. Father completed a total of sixty-six hours, but Carithers testified that she did not believe that he had benefited greatly from the treatment. *Tr. Vol. I* at 161-62. Father quit going to the group meetings because of conflicts with his work schedule, although there were other sessions to accommodate his work schedule.

In December 2011, Father was referred to Doug Essex ("Essex"), an addictions counselor with Wabash Valley Alliance, and Essex diagnosed Father with opiate dependence and alcohol abuse. Individual substance abuse counseling was recommended, and Father started individual counseling on January 3, 2012. In August and September 2012, Father was going to be successfully discharged from Wabash Valley Alliance, but he cancelled his last appointment and never went back. Because Father never met with Essex in October or November 2012, he was not successfully discharged. Father testified

4

that he did not complete treatment due to "work complications" and that he never completed any drug treatment offered to him by DCS. *Id*. at 35.

Prior to the CHINS case, father pleaded guilty to public intoxication in 2006. On March 2, 2011, Father was arrested and charged with Class B felony dealing heroin. On July 23, 2013, Father was arrested for operating while intoxicated as a Class A misdemeanor. In September 2013, he was arrested for violating a condition of his bond. On November 8, 2013, Father pleaded guilty to possession of a controlled substance as a Class D felony, and his Class B felony dealing in heroin charge was dismissed. Father was incarcerated from September 2013 until December 9, 2013, and upon his release from jail, he began serving six months home detention for his guilty plea.

On January 27, 2011, Father was referred for home-based services, and Jacqueline Petrie ("Petrie") was assigned as his home-based case manager. She worked with Father on transportation, hygiene and grooming supplies, and parenting and supervision. By the time of the evidentiary hearings, Father had stopped participating in home-based services.

Father was also offered visitation services and was informed of the attendance policies prior to beginning visitations with Child. Father was supposed to confirm his visitations in a timely manner, and if he failed to do so, the visitation would be cancelled. Father often failed to confirm his appointments in time and missed multiple visitation appointments. In all, Father missed 79 visitations out of the 285 offered to him from 2011 through 2013. Beginning February 17, 2011, visitations were supervised and remained so until December 2011. During this time, Petrie was concerned because the parents were not attending visitations and that Father did not participate as much as Mother did. In January

5

2012, Child started having overnights with Mother and Father; however, after Mother passed away in February 2012, visitations stopped for a short time to give Father "time to regroup." *Tr. Vol. I*. at 90. When visitations resumed, they were held at DCS and were fully supervised. Father missed all of his scheduled appointments in February, several in March, and most in April 2012.

The visitations were transitioned to Father's apartment starting in August 2012, and weekend visits were started in September 2012. In October 2012, visitations were removed from Father's apartment due to the lack of cleanliness of the apartment and the hazards to Child that were present, such as electrical cords, lots of clutter, and items that posed a climbing danger. After Father remedied the issues, visitations were resumed at his apartment. Father became incarcerated in August 2013 and did not see Child until October 2013 when Child visited Father in jail. At that visit, Child seemed uncomfortable and got under the table and barked like a dog. Father's visits with Child resumed in December 2013 after his release from jail, but from that time until the evidentiary hearings, Father only had one visitation per week for one hour at the DCS office. He missed one appointment in December and three or four visits in January 2014.

When the services were first started, Father was informed that it was not the service providers' job to care for Child, but that they were just there to observe. However, Petrie testified that, throughout the case, one concern was that Father relied too much on the caseworkers to watch Child during visitations. *Id*. at 97. Father would also leave the apartment and just assume that the caseworker would watch Child. Father was often unprepared for visits when the service providers arrived and would have to scramble to put

6

dangerous items away. Since Mother's death in February 2012, Father has not had any unsupervised visitations with Child. He was never able to have a trial home visit or overnight with Child. The service providers testified that they felt that there were safety issues and concerns with leaving Child alone with Father in his apartment. *Tr. Vol. II*. at 21, 102-03.

Prior to Child's birth, Father and Mother lived in Logansport with Mother's other son.[3] On March 10, 2011, they were evicted from that residence, and they then lived with various relatives before moving to an apartment in Lafayette. At the time of the first hearing date on the termination petition in September 2013, Father was incarcerated in the Cass County Jail. He was released in December 2013 and moved to his parents' home to serve his home detention. Throughout the case, the cleanliness and safety of Father's home were issues. Some safety concerns stemmed from the clutter in Father's home, and one service provider was worried about the safety of the home due to mold in the bathroom, hair everywhere, and razors out on the counter. There were many things stacked around the home that posed safety concerns for a toddler. When Father began living with his parents, there were also concerns about clutter in the grandparents' home. At the start of the case, Father's mother would not allow DCS to inspect the home. When the court appointed special advocate ("CASA") and the DCS case manager did inspect it, they found it was very cluttered and did not pass inspection. Additionally, Father's brother also lived at the home, but never underwent the background check requested by DCS in 2011.

---

[3] This child was also removed from the home at the same time Child was.

7

When the CHINS case began, Father was not employed. He was attending Ivy Tech Community College, but never completed his degree. He obtained employment with CTI Staffing at Wabash National in 2011, but lost that job when he was arrested in November 2011. He then became employed at Kirby Risk's machine shop in 2012, but lost that job due to tardiness. Father was later employed at Indiana Packers through a staffing agency from July 11, 2012 through October 31, 2012 when he lost his job due to tardiness. In April 2013, he became employed at Teleservices Direct and was employed there until September 5, 2013 when he became incarcerated. When Father was unemployed, he supported himself with food stamps and through the help of his parents and grandparents. Father remained unemployed at the time of the termination hearing.

At the time of the termination hearing, Child, who was three years old, had been removed from Father for Child's entire life and had been in relative foster care since being released from the hospital after birth. DCS's plan for Child was adoption. The DCS case manager testified that Child needs permanency and that termination was in Child's best interests. *Tr. Vol. III* at 117. The CASA and guardian ad litem ("GAL") also testified that Child needs permanency and that termination was in the best interests of Child. On March 13, 2014, the juvenile court issued its order terminating Father's parental rights. Father now appeals.

**DISCUSSION AND DECISION**

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination

8

of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

Here, in terminating Father's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely

9

because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B)  that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)  that termination is in the best interests of the child; and
>
> (D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

Father argues that DCS failed to prove the required elements for termination by sufficient evidence. Father alleges that DCS failed to present sufficient evidence to prove that the conditions which resulted in Child being removed will not be remedied or that the continuation of the parent-child relationship poses a threat to Child. He also asserts that insufficient evidence was presented to prove that it was in the best interests of Child that

10

his parental rights be terminated. Father additionally contends that several of the juvenile court's findings are not supported by the evidence.

As to Father's argument that several findings are not supported by the evidence, we note that some of the findings he challenges are in fact conclusions, which will be addressed below. Father's remaining contentions that the findings are not supported by the evidence are actually challenges to the weight the juvenile court afforded the evidence presented. He is, therefore, requesting this court to reweigh the evidence, which we cannot do. *In re D.D.*, 804 N.E.2d at 265.

Father's next contention is that DCS did not prove by clear and convincing evidence that the conditions that resulted in Child's removal would not be remedied. He alleges that the reason for Child's removal was Mother's drug use, and because she has since died, the reasons for removal have been remedied. He further argues that the conditions of his home and supervision of Child were not conditions that led to removal of Child because Child was immediately placed in foster care after being released from the hospital.

When a juvenile court decides the issue whether the conditions that led to a child's removal and continued placement outside the home would be remedied, the juvenile court must assess a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re D.D.*, 804 N.E.2d at 266. Additionally, a juvenile court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. *In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012), *trans. denied*. The court may also consider the parent's habitual patterns of conduct, as

11

well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id*. The court may also consider any services offered by the DCS to the parent and the parent's response to those services. *Id*. Parental rights may be terminated when parties are unwilling or unable to meet their parental responsibilities. *Id*. at 265.

The evidence showed that Child was removed from Father's care at birth due to the fact that Mother abused drugs during her pregnancy and Child tested positive for benzodiazepines, opiates, and THC. The CHINS petition also alleged that both parents had a substance abuse problem which impaired their ability to care for Child. Therefore, Child was not removed solely on the basis of Mother's drug abuse. Further, the statute focuses not only on the initial reason for removal of a child when determining whether parental rights should be terminated, but also looks to the reasons for continued placement outside the home. I.C. § 31-35-2-4(b)(2)(B). Other evidence showed that Father tested positive for hydrocodone and methadone on February 28, 2011 and for heroin and morphine on May 4, 2011. He testified that he continued to use morphine throughout the beginning of the CHINS case until June 15, 2011. *Tr. Vol. III* at 217. Father tested positive for alcohol and Spice on February 15, 2012, and for alcohol and bath salts on March 13, 2012. Throughout most of the rest of 2012, no drug screens were done. Father tested positive for alcohol on April 17, 2013 and again on May 22, 2013. Although Father did not test positive for any substances since May 22, 2013, he missed ten drug screens in 2013, and the last drug screen administered to him was on August 29, 2013. Father never completed a substance abuse program at the time of the termination hearing, and he failed

12

to consistently take drug screens as ordered by the juvenile court. Both of Father's addiction counselors testified that Father's use of alcohol signified that he still had a problem and that he needed to abstain from all substances to be drug free. *Tr. Vol. I* at 167, 190-91.

During the CHINS case, Father was incarcerated several times – all for drug and alcohol related offenses. Father was arrested and charged with Class B felony dealing heroin on March 2, 2011 and for Class A misdemeanor operating while intoxicated on July 23, 2013. In September 2013, he was arrested for violating a condition of his bond. Father pleaded guilty to possession of a controlled substance as a Class D felony in his dealing in heroin case and was incarcerated from September 2013 until December 9, 2013. At the time of the termination hearing, he was serving six months home detention as a result of his guilty plea.

Although Father contends he was not offered any parenting classes, he testified that he was offered home-based services and that those services included parenting classes. *Tr. Vol. III* at 205. There was also evidence that Father was given an opportunity to participate in parenting classes when Mother was alive, but that he did not participate in those classes. *Tr. Vol. I* at 118. At some point during the proceedings, one of the service providers stopped providing services other than visitation services to Father due to his lack of participation. *Tr. Vol. III* at 36. Additionally, although Father obtained employment during a portion of the proceedings, he failed to maintain the employment for long periods of time due to either the inability to be on time or his criminal activity.

As for visitations, the evidence showed that Father often failed to confirm his appointments in time and missed multiple visitation appointments; in all, Father missed 79 visitations out of the 285 offered to him from 2011 through 2013. When the visitations did occur, Father relied too much on the caseworkers to watch Child during visitations although he had been informed that it was not the service providers' job to care for Child, and he would leave the apartment and just assume that the caseworker would watch Child. Since Mother's death in February 2012, Father has not had any unsupervised visitations with Child, and the service providers felt that there were safety issues and concerns with leaving Child alone with Father in his apartment. Throughout the case, the cleanliness and safety of Father's home were issues. Some safety concerns stemmed from the clutter in Father's home, and service providers worried about the safety of the home due to the many things stacked around the home that posed safety concerns for a toddler. When Father began living with his parents, there were also concerns about clutter in the grandparents' home. When the CASA and the DCS case manager inspected the home, they found it did not pass inspection due to the excessive clutter. Additionally, Father's brother also lived at the home, but never underwent the background check requested by DCS in 2011. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of Child outside Father's home would not be remedied.

To the extent that Father contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child, we need not address such argument.

14

Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of Child from Father's care would not be remedied, we will not address any argument as to whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Child.

Father's final argument is that insufficient evidence was presented to prove that termination was in the best interests of Child. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.*, 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

15

The evidence at the termination hearing showed that Child had been removed from Father's care for Child's entire life and had never resided in Father's home. While Mother was still alive, she was the primary caregiver during visitations. Since she passed away, Father has not had any unsupervised visitations with Child. The service providers never felt that Child was safe to be alone with Father due to the safety issues in his apartment and his reliance on the caseworkers to watch Child during visitations. Father was given three years to reunify with Child, but he failed to consistently visit with Child, maintain stable employment and safe housing, refrain from criminal behavior, complete a substance abuse program, comply with all of his drug screens, and consistently participate in home-based services. The DCS case manager, CASA, and GAL all testified that Child needed permanency and that termination was in Child's best interests. Based on the evidence presented, we conclude that sufficient evidence was presented to prove that termination of Father's parental rights was in the best interests of Child.

We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Child was clearly erroneous. We therefore affirm the juvenile court's judgment.

Affirmed.

FRIEDLANDER, J., and CRONE, J., concur.